C. B. CHITTIM, Appellant,

v.

TEXAS PACIFIC COAL AND OIL COMPANY, a corporation, Appellee.

No. 7206.

United States Court of Appeals
Tenth Circuit.

May 16, 1963.

Howard K. Phillips, Denver, Colo. (Jack G. Howe, Denver, Colo., and J. F. Mahoney, Casper, Wyo., were with him on the brief), for appellant.

Frederic L. Kirgis, Denver, Colo. (Edward L. True, Denver, Colo., and Thomas O. Miller, Cheyenne, Wyo., were with him on the brief), for appellee.

Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.

HILL, Circuit Judge.

C. B. Chittim, appellant, commenced this action in the state court against Texas Pacific Coal and Oil Company, appellee, for the alleged breach of what is commonly known in the oil and gas industry as a farmout agreement, providing for the drilling of an oil and gas well in Crook County, Wyoming. Texas Pacific, with a corporate existence in the State of Texas, removed the same to the Federal court, where trial was had to the court, without a jury, resulting in a judgment against appellant. Judgment was also entered allowing appellee recovery against Chittim on a counterclaim for money expended as attorney fees in contesting lien claims against the oil and gas well in question. Chittim's appeal followed.

In pertinent part, the farmout agreement provided: Chittim was to commence the actual drilling of a test well upon the lease belonging to Texas Pacific on or before October 5, 1959; he was to complete the same, without cost to Texas Pacific, within 60 days; the drilling must continue to a depth of 3500 feet, or to a sufficient depth to test the Minnelusa formation, or to a depth where conditions made drilling impracticable; the judgment of Texas Pacific was conclusive as to identity of all formations, the depth at which such formations were encountered, the sufficiency of tests and whether or not any fluid recovered was in conclusive quantities; if a producing well was drilled, Chittim, at his sole expense, was to complete and fully equip the well for production into tanks; if a dry hole was drilled, Chittim was to properly plug and abandon the same at his sole expense; if a dry hole was timely drilled and completed, Texas Pacific was to execute and deliver to Chittim an assignment of an undivided one-half interest in the lease; and if the well was completed as a producer in commercial quantities, the parties agreed to enter into a joint operating agreement, with the precise terms of that prospective agreement set out. Also, under the agreement, Chittim agreed to indemnify and hold Texas Pacific harmless from loss by reason of any claim arising out of the operations; he agreed to pay an equal share of all delay rentals and minimum royalties; and Texas Pacific agreed to pay Chittim the sum of $3800.-00 as dry hole money because of a dry hole previously drilled as an offset well to the lease involved and known as the Barton No. 2.

The complaint alleged: The execution of the farmout agreement; Chittim had fully performed, or was ready and willing at all times to perform, all of the provisions of the agreement; after repeated demands Texas Pacific failed and refused to perform its part of the contract; and by reason of such breach, he was entitled to recover damages in the amount of $1,465,000.00. Appellee's answer and counterclaim denied any breach on its part and alleged: Chittim failed to complete either a producing well or a dry hole within 60 days or without cost to it; Chittim failed to make satisfactory production tests; he failed to furnish defendant with drilling reports or copies of the required State of Wyoming forms as provided for in the agreement; he failed to reimburse it for delay rentals paid, and did not indemnify and hold it harmless because of claims arising out of the drilling operations. Appellee also pleaded estoppel and waiver as affirmative defenses and set up three counterclaims, the only one with which we are concerned being for attorney fees paid by Texas Pacific in defending against lien claims made by third parties against the lease because of Chittim's drilling operations.

The test well, known as the State No. 6 well, was timely commenced by Chittim and drilling operations were continued to a depth of about 3900 feet. It was apparently assumed by Chittim at that time that the well could be completed as a commercial producer as production casing was then set. This drilling depth met the depth requirements of the agreement. Various tests were made upon the well at this point in the drilling efforts and the well was swabbed at the rate of 5 barrels of oil per hour. On about December 1, 1959, a pump was installed on the well and connected with a temporary tank installation. From this time on, difficulties were encountered in producing oil in commercial quantities from the well. A permanent tank battery was ordered by Chittim to replace the temporary tank and was delivered to the well site, but it is undisputed that the permanent tanks were never set or used and were eventually repossessed by the vendor. Chittim's experts testified that the well was completed as a producer, but experts on behalf of Texas Pacific disagreed and testified that the well was not completed because the permanent tanks had not been set in cement and connected to the pump by Chittim as called for by the farmout agreement. Between December 1, 1959, and January 1, 1959, some oil, together with other fluids, was pumped from the well, but, on or about the later date, Chittim caused the well to be shut down and did nothing thereafter to complete the well, under the terms of the agreement, as either a commercial producer or as a dry hole.

In December, Chittim first asked Texas Pacific to pay him the $3,800.00 dry hole money for his drilling of the Barton No. 2, which he had drilled prior to the commencement of the well in question. The evidence is clear that he was in financial difficulties and Texas Pacific did, on January 15, 1960, make this payment to him. Chittim, after shutting down the well in question, made several futile attempts to procure a new farmout agreement with Texas Pacific. In March, 1960, Chittim requested an assignment of a part of the lease under the "dry hole" provision of the farmout agreement, which demand was refused. Eventually both materialmen's and mechanics' liens were filed by Chittim's creditors against the drill site of State No. 6, and Texas Pacific was compelled to later go into court and defend foreclosure suits involving these liens in order to protect its lease. During the course of this lien litigation, one of the lien holders, by agreement with Texas Pacific, pulled and salvaged the well casing, and plugged the well in accordance with requirements of the State of Wyoming relating to the abandonment of a dry hole. In the defense of these lien suits, Texas Pacific paid $1,128.28 as attorney fees. The evidence also shows that Chittim failed to pay his share of the delay rentals upon the lease and admitted to Texas Pacific his bad financial condition and financial inability to do anything more on the well.

With these evidentiary facts before him, the trial judge found that Chittim failed to sustain his burden of proof; that Texas Pacific did not breach the agreement; that Chittim failed to perform his part of the agreement in that he did not complete a producing well at his sole expense or at all and failed to perform under the alternatives available in the event of a non-producer; and that Texas Pacific was entitled to recover $1,128.28 for attorney fees paid defending the lien claims.

█ Appellant argues seven points of error on this appeal. However, as we view the case, it is primarily one of fact, and a determination of the sufficiency of the evidence to support the trial court's findings will adequately dispose of all questions raised here. And, of course, those findings must be accepted upon appeal if they are supported by the record. Wise v. United States, 10 Cir., 297 F.2d 822, cert. denied, 369 U.S. 876, 82 S.Ct. 1148, 8 L.Ed.2d 279.

█ At the outset it should be observed, as the trial court found and as the parties here seem to agree, that the

farmout agreement is plain and unambiguous. The obligations of the agreement imposed upon each of the parties thereto are fully set forth in no uncertain terms. Therefore, under the agreement and the evidence adduced at the trial, the sole issue concerns the question of performance or breach of the agreement by the parties bound thereby.

Beyond any question there is substantial evidence in the record to support the findings of fact made by the trial court. Under this substantial evidence, it may be concluded, as the lower court did, that Chittim breached various conditions of the farmout agreement. There is no question but that he failed to pay his part of the delay rental upon the State lease. The agreement, as does all such farmout agreements in the oil industry, contemplated the drilling of a well, to be completed either as a commercially producing oil well or as a dry hole. The completion of the well, as either a producer or a dry hole, had to be in accordance with the terms of the agreement and without cost to Texas Pacific. If the well was a producer Chittim was bound to "complete and fully equip the well for production into the tanks" at his own expense, and if the well was a "dry hole" he was bound to "properly plug and abandon it", at his own expense. There was no factual issue in the case concerning the completion of the well as a "dry hole". Chittim took that issue out of the case by his answer to Interrogatory No. 1(c) where he stated the test well was not completed as a dry hole. That answer eliminated any necessity for a finding by the trial judge on the question, and limited the issue of Chittim's performance under the contract to the completion of a commercially producing well. On this issue the evidence, without dispute, shows that Chittim failed to install permanent tanks attached to the pump, and there is evidence that he stated that the well had been ruined as a producer. The evidence is also undisputed that Chittim did nothing with the well, after he shut it down, to complete it as a commercial producer.

In effect, he abandoned the well, and at the time had unpaid drilling expense exceeding $33,000.00, which he never paid.

Although, as we have stated, the case is a factual one, in connection with the facts, appellant makes certain legal contentions that should be given consideration here. Chittim seeks to invoke the doctrine of substantial performance to avoid his breach of the contract. We certainly recognize that doctrine; but, under the evidence, it cannot be concluded that Chittim substantially performed his part of the agreement in view of his abandonment of the well, his failure to pay drilling expense in excess of $30,000.00, his failure to purchase and set the tank battery and his failure to pay his share of the delay rental due under the lease.

■ Appellant next contends that because Texas Pacific paid Chittim the $3,800.00 dry hole money on the Barton No. 2 well, it should be estopped to deny that Chittim completed a well. The cover letter from Texas Pacific to Chittim enclosing the payment is a complete answer to this contention, as it expressly recognized that the well had not been completed.

■ Chittim also argues that the State No. 6 was a "completed well" within the meaning of that term as defined in Boatman v. Andre, 44 Wyo. 352, 12 P.2d 370, and other authorities, and that the refusal of Texas Pacific to take over the operation of the well upon his demand constituted a breach of the contract. The trouble with this argument is that, in determining whether the State No. 6 was a completed well, we must look to the terms of the farmout agreement rather than to the definition set forth in the Boatman case. It is obvious from what has already been said that Chittim did not complete the well, at his own expense, as a commercial producer under the terms of the agreement. And, since he did not do so, Texas Pacific was not obligated to take over the operation of the well. It is likewise clear that he did not complete the well as a dry hole in that

he did not "properly plug and abandon the same at his sole expense". Therefore, Texas Pacific was not obligated to make the lease assignment provided for in the agreement.

Lastly, appellant attacks the trial court's action in granting Texas Pacific a judgment upon one of its counterclaims in the amount of $1,128.28 for attorney fees. The necessity for Texas Pacific to employ attorneys to protect its interests in the state court lien foreclosure suits was the direct result of Chittim's failure to pay the drilling costs upon the well in question, which constituted a breach of the farmout agreement by Chittim. We think these fees, incurred as a result of appellant's breach of the agreement, were properly recoverable by Texas Pacific from Chittim.

Affirmed.