Filed 12/1/15  P. v. Gantan CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HEILE MARIE GANTAN,<br><br>    Defendant and Appellant. | C075356<br><br>(Super. Ct. No. 11F03958) |

Defendant Heile Marie Gantan appeals her conviction for leaving the scene of a deadly or dangerous accident. (Veh. Code, § 20001, subd. (a).) She contends the evidence is insufficient to support her conviction for that crime.

We disagree and will affirm the judgment.

## FACTUAL SUMMARY

Defendant was driving a BMW sedan, with codefendant Ladonna Maria Torres in the front passenger seat and Oscar Camero in the rear seat behind the driver. While traveling southbound on Power Inn Road, defendant's car suddenly turned east and drove over the median, continued across the northbound lanes, uprooted a tree, struck a light pole, flipped onto its roof, and slid upside-down until it came to a stop. Defendant and

1

Torres were able to extricate themselves from the car with only minor injuries. Camero remained strapped in his seat, having suffered injuries that were ultimately fatal. Defendant and Torres repeatedly yelled Camero's name, but he did not respond.

Alexander Garcia and his girlfriend Carolina Alvarez were driving along Power Inn Road when they came upon the accident scene. Defendant and Torres were standing next to the overturned car and appeared to "be in a panic." Garcia parked his car, and he and Alvarez talked to defendant and Torres, who asked Garcia and Alvarez to help their friend, Camero. Torres was holding a cell phone. Garcia asked, "Did you guys call 9-1-1?" Torres told him they called "somebody." Defendant asked Garcia, "Can you help my friend Oscar?"

Garcia smelled alcohol and asked the girls if they had been drinking. Defendant did not respond. Torres admitted she had been drinking but indicated defendant was the one driving.

Torres asked Garcia if she could use his cell phone. Garcia handed his phone to her and ran to the overturned BMW to try to help Camero. He called out to Camero for approximately 15 to 20 seconds but did not get a response, so he gave up and returned to the group.

Meanwhile, while defendant stood there silently, Torres used Garcia's phone to call Louie Mallare at 4:37 a.m. She told Mallare they had been in a car accident and asked him to "come here now" and help get Camero, who was still in the overturned car.

Garcia suspected Torres and defendant had not actually called the police, so he called 911 himself.[1] When he ran to the street corner to get the name of the street for the 911 operator, defendant and Torres walked quickly away from the accident scene. Before they left, Alvarez heard Torres tell defendant that "she needed to tell someone

_____

[1] Alvarez testified that when she and Garcia asked the girls again if they had called 911, Torres asked if Garcia and Alvarez would call for them.

2

about the accident." Garcia and Alvarez waited at the accident scene until law enforcement officers arrived and informed the responding officers that Camero was underneath the overturned car.

City of Elk Grove Police Officer Jason Jimenez was one of the officers dispatched to the accident scene. On his way there, he saw a woman, later determined to be defendant, walking southbound on Power Inn Road away from where the accident occurred. Officer Jimenez continued to the accident scene. When he arrived, Garcia and Alvarez immediately approached him and told him the two girls walked away from the accident going southbound on Power Inn Road. Jimenez radioed to an incoming officer to stop the woman he had seen walking earlier.

Elk Grove Police Officer Daniel Emerson was also dispatched to the scene and was the third patrol unit to arrive. As other patrol cars passed defendant and Torres, neither girl turned around or walked back to the accident scene. On his way there, Officer Emerson saw two females, later identified as defendant and Torres, walking southbound on Power Inn Road. He parked his patrol car next to the sidewalk. Torres motioned to him with her hands, but defendant continued walking southbound on Power Inn Road. Officer Emerson instructed defendant to "come back." She complied. Other than telling Officer Emerson her car had been travelling southbound, defendant was unable to tell him whether or not she had been involved in an accident. She did, however, provide her name, date of birth, address, and telephone number. Torres told him her friend was trapped inside the BMW and she was trying to get help.

Elk Grove Police Officer Daniel Templeton was also dispatched to the accident scene. He made contact with defendant within 20 minutes of his arrival. He found her to be "pretty calm, which struck [him as] odd considering she was involved in a major vehicle collision. She didn't appear worried about anything." At some point, defendant asked, "Is he okay?" as she pointed toward the BMW. When Officer Templeton said he did not know, she began to cry. Officer Templeton noticed a "moderate to strong" odor

3

of alcohol "emitting from" defendant as he spoke to her; when she spoke back, the smell of alcohol became stronger. Defendant also had red, watery eyes and swayed slightly as she stood talking to him.

Officer Templeton noticed defendant had multiple abrasions on the left side of her face, but she declined to be transported to the hospital. Prior to conducting a field sobriety test, Officer Templeton asked defendant some questions, including whether she had been drinking alcohol. Defendant denied having consumed any alcohol. After conducting the field sobriety test, Officer Templeton formed the opinion that defendant was impaired. She was transported to the hospital, where a blood test was administered. The results of that blood test showed defendant's blood alcohol content was 0.10 percent. Defendant's blood sample also revealed the presence of THC, the psychoactive component in marijuana.

Lorna Alejandro, whose home backs up to Power Inn Road, was awakened at 4:30 a.m. by the sound of the accident. After several minutes passed, Alejandro woke her husband. Shortly thereafter, she heard girls' voices calling "Oscar, Oscar" over and over again. She got dressed and ran downstairs as she called 911. She later testified that she placed the 911 call at 4:38 a.m. She heard frantic voices saying, "help, call." She also heard the sound of police sirens. She drove her car around the corner, where she saw a police officer and a fire truck with lights. She did not see defendant or Torres.

Alejandro's neighbor, Bruno Marchesi, also woke to the sound of the accident. He went to his backyard and saw two young women climb out of the overturned BMW and pace around it yelling, "Oscar, Oscar, Oscar." Marchesi went back inside and called 911. When he returned to his backyard, the two young women were walking southbound toward Sheldon Road, away from the accident scene. He heard sirens and saw emergency response vehicles making their way to the accident.

Torres's friend Mallare testified that after receiving the call from Torres, he called 911 of his own accord and drove to the intersection of Power Inn Road and Sheldon

4

Road.  However, the street was blocked off by law enforcement and emergency vehicles, and he was told to leave.  He did not see Torres or defendant.

Forensic pathologist Stephany Fiore performed the autopsy on Camero.  Among the injuries sustained by Camero, Dr. Fiore found he had suffered a "fairly immediately lethal" hinge fracture of the skull and opined that no matter how quickly he might have received medical treatment, he still would have died from the injury.  She noted, however, that one would not be able to detect the hinged skull fracture injury by looking at Camero's body, although blood coming out of his ears would be an indication of a fracture in that area.  She opined that Camero died from injuries related to blunt force trauma to his head and chest or left shoulder.

Torres and defendant both testified at trial.  Torres testified that defendant walked away from the scene of the accident because she "was trying to get her phone.  That was her goal, like was to get help, get her phone."

Defendant denied knowingly drinking any alcohol prior to the accident and denied ever drinking alcohol at all.  She testified she did not know how she became intoxicated or who might have put alcohol in the lemonade she was drinking.

Prosecution rebuttal witness Arial Gilmore testified that she and defendant "took a couple of shots" of Captain Morgan rum together at defendant's house prior to the accident.  Rebuttal witness Kim Nguyen testified that she and defendant smoked marijuana together several years prior to the accident, and she once saw defendant "drunk" at a casino.

## PROCEDURAL BACKGROUND

Defendant was charged by amended information with vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)—count one), causing bodily injury while driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)—count two), causing bodily injury while driving with a blood alcohol level at or above 0.08 percent (§ 23153, subd. (b)—count three), and leaving the scene of a deadly or injurious accident

5

(Veh. Code, § 20001, subd. (b)—count four), sometimes called "hit and run."[2] The amended information alleged that, as to count one, defendant fled the scene of the vehicular manslaughter (§ 20001, subd. (c)), and as to counts two and three, defendant personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). The prosecution later dismissed the vehicular manslaughter charge (count one).

The jury found defendant guilty of all three remaining counts and found true the great bodily injury allegations.

The court sentenced defendant to an aggregate term of five years in state prison, comprised as follows: a term of two years on count two, plus a consecutive three-year term for the great bodily injury enhancement; a concurrent two-year term on count four; and a two-year term on count three, stayed pursuant to Penal Code section 654.

Defendant filed a timely notice of appeal.

**DISCUSSION**

Defendant contends the evidence was insufficient to support a conviction for "hit and run" under Vehicle Code section 20001, subdivision (b). She claims she complied with the requirements set forth in the Vehicle Code by providing the necessary assistance to her fatally injured passenger, Camero, and cooperating with law enforcement officers by providing her personal identifying information. The claim lacks merit.

"The driver of a vehicle involved in an accident resulting in injury to a person, other than . . . herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of [Vehicle Code] Sections 20003 and 20004." (Veh. Code, § 20001, subd. (a).)

Vehicle Code section 20003 provides as follows: "The driver of any vehicle involved in an accident resulting in injury to or death of any person shall also give . . . her

---

[2] Count five of the amended information charges codefendant Torres, who is not a party to this appeal.

name, current residence address, the names and current residence addresses of any occupant of the driver's vehicle injured in the accident, the registration number of the vehicle . . . she is driving, and the name and current residence address of the owner to the person struck or the driver or occupants of any vehicle collided with, and shall give the information to any traffic or police officer at the scene of the accident. The driver also shall render to any person injured in the accident reasonable assistance, including transporting, or making arrangements for transporting, any injured person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if that transportation is requested by any injured person." (§ 20003, subd. (a).)[3]

We assess the sufficiency of the evidence to support a conviction under the substantial evidence test. (*People v. Cuevas* (1995) 12 Cal.4th 252, 257, 272.) The standard is the same under the state and federal due process clauses. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Cuevas*, *supra*, 12 Cal.4th at pp. 260-261.) Substantial evidence is evidence which is reasonable, credible, and of solid value. (*Id*. at p. 260.) Evidence that merely raises a strong suspicion of the defendant's guilt is insufficient to support a conviction. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

In reviewing the record, we presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) And we resolve all conflicts in the evidence and all

---

[3] Vehicle Code section 20004 applies only "if there be no traffic or police officer at the scene of the accident to whom to give the information required by [Vehicle Code] Section 20003" and is therefore not relevant here.

7

questions of credibility in favor of the verdict. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) We will reverse a judgment for insufficient evidence only if it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Defendant claims that, because the evidence established she cooperated with law enforcement officers "at the accident scene" and gave her personal identifying information to them, the only question is whether she rendered "reasonable assistance" to Camero. We disagree.

As a preliminary matter, defendant's initial premise that she cooperated with law enforcement at the scene is not supported by the evidence. Defendant and Torres left the accident scene soon after Garcia and Alvarez stopped to render assistance and *before* law enforcement arrived. The two women walked southbound on Power Inn Road toward Sheldon Road, away from the accident scene. Neither one turned around or attempted to return to the accident scene as the first patrol car, and then a second, passed them by. Even as Officer Emerson parked his patrol car at the curb and Torres motioned to him, defendant continued walking in the opposite direction, stopping only when Officer Emerson instructed her to "come back." At that point, she provided her name, date of birth, address, and telephone number. However, she was unable to tell Officer Emerson that she had been involved in an accident or that Camero was still trapped inside the overturned BMW. There is sufficient evidence that defendant failed to remain at the scene and provide law enforcement with her identifying information.

Defendant claims she stopped at the scene of the collision and "attempted to determine the extent of the injury suffered by [Camero], and ensure that someone render him aid," as evidenced by her screams and pleading overheard by neighbors and those who arrived at the scene. She further claims that because of Camero's fatal injuries, there was nothing she could add to the assistance already being given by the passersby, neighbor Alejandro, responding law enforcement officers, and fire department personnel

8

who arrived later on the scene, and any additional act she might have performed could have been more of a hindrance than a help.

Defendant's attempts to characterize her actions as efforts to aid Camero are unavailing. Vehicle Code section 20003, subdivision (a) provides that "reasonable assistance" includes "transporting, or making arrangements for transporting, any injured person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that treatment is necessary . . . ," none of which was attempted by defendant. According to Garcia and Alvarez, when they arrived on the scene defendant and Torres were standing next to the overturned car looking panicked. Both asked for help for their friend, and defendant asked Garcia, "Can you help my friend Oscar?" Nearby residents Alejandro and Marchesi testified they heard the sound of the crash followed by the young women's voices yelling, "Oscar, Oscar" over and over again. Alejandro also heard frantic voices calling, "help, call." Short of repeatedly calling Camero's name and asking Garcia and Alvarez to help, defendant made no attempt to assess Camero's injuries or determine what, if any, treatment was necessary by looking inside the overturned car or by any other means. Similarly, she made no effort to correct Garcia's possible impression that either she or Torres had already called 911, nor did she ask Garcia or Alvarez to borrow a phone so she could do so herself. Instead, she stood by silently while Torres called Mallare. When Garcia called 911 of his own accord and ran to the street corner to ascertain the exact location of the crash for the 911 operator, defendant quickly left the scene with Torres.

Defendant argues that when she and Torres left the scene, emergency vehicles were on their way and three people were tending to Camero. Thus, she fulfilled her moral and legal obligation to assist Camero when she was sure that aid was present and further assistance was forthcoming. We think not. Again, defendant made no attempt to call 911 herself or ensure someone else made the call. She left the scene without assisting Garcia and Alvarez, confirming Garcia's efforts to contact 911 were successful,

9

or providing any or all of the necessary information for a prompt response. When she left, no one was tending to Camero.

Defendant claims she "spent the moments following the crash imploring anyone and everyone to help Oscar," but because he suffered a fatal hinge skull fracture, there was nothing she or anyone else could do to help him. As support for that claim, she relies on *People v. Scofield* (1928) 203 Cal. 703 (*Scofield*). There, the defendant collided with another car, rendering the other driver unconscious. A crowd gathered immediately after the accident. While one bystander summoned an ambulance, others removed the victim from the wreckage and tended to him until the ambulance arrived and transported him to the hospital, where he died several hours later. The defendant, who himself was rendered momentarily unconscious, awoke, left his vehicle, and walked over to the victim's car, where the crowd had gathered. He did not identify himself or attempt to assist the victim, who by that time had already been removed from the wreckage and was being cared for by "more persons . . . than were necessary." After all the injured were removed from the scene, the defendant walked home. (*Id.* at pp. 705-707.) He was convicted of various charges, including violation of "section 141 of the California Vehicle Act" (Stats. 1923, p. 562), which required him to immediately stop and give his identifying information "to the person struck or the occupants of the vehicle collided with" and to render "all necessary assistance, including the carrying of such persons to a physician or surgeon for medical or surgical treatment, if such treatment is required . . . ." (*Scofield*, at p. 706.)

The Supreme Court reversed the defendant's hit-and-run conviction, concluding there was insufficient evidence to support it. (*Scofield*, *supra*, 203 Cal. at p. 707.) The court held that the defendant was not required to give his identifying information to the unconscious victim, noting that section 141 of the California Vehicle Act (the version of the hit-and-run statute in effect at that time) did not "require the impossible," and that the defendant's assistance "was not *necessary*" as "the deceased was given all the assistance that could be required without the aid of the defendant." (*Scofield*, at pp. 708-709.)

10

*Scofield* is distinguishable.  The challenged statute has changed since 1928 and now requires the driver of a vehicle involved in an accident to provide identifying information to not only any occupant of the driver's vehicle injured in the accident, but also "to any traffic or police officer at the scene of the accident."  (Veh. Code, § 20003, subd. (a).)  As previously discussed, defendant failed to do so.  Further, unlike *Scofield*, where the defendant could not comply with the requirement to provide identifying information to the unconscious victim and numerous good Samaritans immediately pulled the victim from the wreckage and tended to him as they waited for the ambulance summoned by one of the bystanders, here the victim was trapped in the overturned car with no one tending to his injuries, neither defendant nor Torres called 911, and both left while Garcia was in the process of making that call.

Defendant also draws our attention to *People v. McKee* (1926) 80 Cal.App. 200 (*McKee*).  There, the defendant was convicted of violating section 141 of the Motor Vehicle Act (Stats. 1923, p. 517), the hit-and-run statute in effect at that time, after he struck and instantly killed the victim and continued on without stopping.  (*McKee*, at pp. 202-203.)  On appeal, the defendant argued the victim's death negated his obligations under the hit-and-run statute as "no assistance was possible" given that the victim was killed instantly.  (*McKee, supra*, 80 Cal.App. at p. 203.)  The Court of Appeal affirmed, holding the defendant had unfulfilled obligations notwithstanding that the victim died instantly.  (*Id*. at pp. 203-204.)  "There was at least such assistance to be rendered as would comply with the respect due from one human to another who has passed beyond the veil of materiality. . . .  [I]t was the defendant's duty under any view of the situation to stop his machine and stand ready to comply with the various provisions of the law, regardless of whether or not the person struck was sufficiently injured to require assistance or so seriously injured that assistance was no longer necessary to her material well-being.  He made no attempt to comply . . . ."  (*Id*. at p. 204.)

11

Defendant makes an effort to distinguish *McKee*, arguing she stopped at the scene of the accident and attempted to determine the extent of Camero's injuries, but there was nothing she could do to assist those already rendering aid. We are not persuaded.

Here, defendant had no alternative but to stop, given that the BMW she was driving finally came to rest on its top. Thereafter, she did little to render assistance to Camero other than calling his name and asking Garcia, "Can you help my friend Oscar?" She did not know Camero was deceased and could not have known according to the testimony of Dr. Fiore, the forensic pathologist. Even if that fact had been obvious to defendant, she nonetheless failed her duty to "stand ready to comply with the various provisions of the law, regardless of whether or not [Camero] was sufficiently injured to require assistance or so seriously injured that assistance was no longer necessary to [his] material well-being." (*McKee*, *supra*, 80 Cal.App. at p. 204.)

Based on the evidence presented at trial, we conclude there was sufficient evidence to support defendant's conviction for leaving the scene of a deadly collision in violation of Vehicle Code section 20001, subdivision (a).

## DISPOSITION

The judgment is affirmed.

RAYE , P. J.

We concur:

HULL , J.

ROBIE , J.

12